## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

VIRGINIA A. MOSES,

     Plaintiff,

v.                                             CIVIL ACTION NO. 3:20-cv-00202

ANDREW SAUL,
Commissioner of Social Security,

     Defendant.

### PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Virginia A. Moses ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f. (ECF No. 2.) By standing order entered on January 4, 2016, and filed in this case on March 23, 2020, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 4.) Presently pending before this Court are Claimant's Brief in Support of Judgment on the Pleadings (ECF No. 16) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 17).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 16), **GRANT** the

Commissioner's request to affirm his decision (ECF No. 17), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 41 years old at the time of her alleged disability onset date and 53 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 253.)[1] She is a high school graduate. (*Id.* at 271.) She has never worked. (*Id.* at 270.) Claimant alleges that she became disabled on March 30, 2007, due to diabetes, "bala[n]ce problems," cataracts, "memory," neuropathy, "hearing problems," "torn rotary cup [sic] in right shoulder," "bone on left knee," and arthritis. (*Id.* at 266, 270.)

Claimant protectively filed her application for benefits on December 20, 2016. (*Id.* at 12, 253–58.) Her claim was initially denied on May 22, 2017, and again upon reconsideration on August 7, 2017. (*Id.* at 174–78, 181–83.) Thereafter, on September 20, 2017, Claimant filed a written request for hearing. (*Id.* at 189.) An administrative hearing was held before an ALJ on January 11, 2019, in Huntington, West Virginia. (*Id.* at 30–68.) On January 30, 2019, the ALJ rendered an unfavorable decision. (*Id.* at 9–29.) Claimant then sought review of the ALJ's decision by the Appeals Council on March 19, 2019. (*Id.* at 248–52.) The Appeals Council denied Claimant's request for review on January 29, 2020, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id.* at 1–6.)

Claimant timely brought the present action on March 20, 2020, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) The Commissioner filed an Answer (ECF No. 13) and a transcript of the administrative

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF Nos. 14 and 15.

proceedings (ECF Nos. 14, 15). Claimant subsequently filed her Brief in Support of Judgment on the Pleadings (ECF No. 16), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 17). As such, this matter is fully briefed and ready for resolution.

### B. Relevant Medical Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

### 1. Consultative Medical Examination: Dr. Stephen Nutter, M.D.

Occupational medicine specialist Dr. Stephen Nutter, M.D. ("Dr. Nutter") completed a consultative medical examination of Claimant on May 2, 2017. (Tr. at 532–37.) He wrote that Claimant reported "problems with diabetes for 9 or 10 years," which she treated with "oral medications as well as insulin." (*Id.* at 532.) She stated that she "has never been hospitalized for the diabetes," but she experienced "hypoglycemic episodes that occur 'not very often'" during which she feels like she is "'about to pass out' and sees spots" but "does not actually lose consciousness." (*Id.*) Claimant told Dr. Nutter that "She has never been told of retinopathy or nephropathy" but "gets numbness in her feet and legs and also in her hands" and "they told her she has neuropathy from the diabetes." (*Id.*) She also reported "a lot of problems with fatigue and lack of energy" and that she "just feels tired a lot because of the diabetes." (*Id.*)

Under "Review of Systems," Dr. Nutter wrote that Claimant "reports problems with shortness of breath" but "denies wheezing, coughing, abdominal pain, hemoptysis, pneumonia, TB, asthma, emphysema, chronic bronchitis, inhaler usage or hospitalization for breathing difficulties." (*Id.* at 533.) She stated that she could "walk 25 yards on flat

3

ground before becoming short of breath and having to stop and rest." (*Id.*) Claimant also reported "constant" joint pain "since 2009" in her hands, wrists, elbows, hips, knees, ankles, feet, and right shoulder. (*Id.*) She related that she had received injections in her right shoulder, right elbow, and right knee but had "never had a joint aspiration done." (*Id.*) She told Dr. Nutter that "walking, standing, kneeling, squatting, and going up and down stairs increases the knee and hip pain," and "reaching, lifting, pushing, pulling, and using the arms overhead will increase the shoulder pain." (*Id.*) Claimant also reported experiencing back and neck pain for four years stemming from a car accident. (*Id.*) She related that "She has intermittent daily lower back pain into the mid low back" that "radiates down both legs" and "intermittent daily neck pain that radiates down both arms." (*Id.*) Claimant told Dr. Nutter that her "back pain is aggravated by bending, stooping, sitting, lifting, standing, coughing, and riding in a car" and walking and that her neck pain "is aggravated by turning the head and rapid motions of the head and neck," coughing, and reaching overhead. (*Id.*) In addition, Claimant stated that she experienced "vomiting . . . due to acid reflux as well as some edema in the legs" but "denies chest pain, abdominal pain, nausea, or hematochezia." (*Id.*)

Upon physical examination, Dr. Nutter observed that Claimant was 5'1" tall and weighed 161 pounds. (*Id.*) He measured her visual acuity at 20/20 in the right eye and 20/50 in the left eye without corrective lenses but noted that her "Visual fields are normal by confrontation." (*Id.*) Her blood pressure was 154/82. (*Id.*) Dr. Nutter noted that Claimant is right-handed and has no leg-length discrepancy. (*Id.*) He observed that she "ambulates with a normal gait, which is not unsteady, lurching, or unpredictable" and that she "does not require a handheld assistive device." (*Id.* at 534.) He further observed that she "appears stable at station and comfortable in the supine and sitting positions"

and "is able to hear and understand conversational voices without difficulty." (*Id.*) He noted no abnormal findings when examining Claimant's head, eyes, ears, nose, and throat, neck, or chest. (*Id.*) He observed "slight edema" in Claimant's lower extremities "with slight early pigmentary changes . . . in the lower legs." (*Id.*) He also noted "diffuse tenderness . . . throughout the abdomen." (*Id.*)

When examining Claimant's upper extremities, Dr. Nutter observed "faint tenderness . . . in the right shoulder, but not the left shoulder," and no crepitus or laxity in the left shoulder. (*Id.*) He wrote that he "was unable to assess" crepitus or laxity in the right shoulder "due to resistance." (*Id.*) A "Tinel's test was negative in the elbows and wrists," the elbows and wrists were nontender, and Dr. Nutter noted "no redness, warmth, swelling or nodules." (*Id.*) He observed reduced range of motion in Claimant's right shoulder and elbow. (*Id.* at 537.) There was "no tenderness, redness, warmth or swelling" of Claimant's hands and "no atrophy," and he related that Claimant "is able to make a fist bilaterally." (*Id.* at 534.) Dr. Nutter noted that Claimant "is able to write and pick up coins with either hand without difficulty," but he had issues measuring her grip strength and stated, "when asked to squeeze my fingers, there is no squeezing noted at all." (*Id.*) He wrote, "The best I could rate grip strength could be 3.5/5 . . . on the right and a 3/5 on the left due to movements against gravity." (*Id.*) The range of motion in Claimant's hands was normal. (*Id.* at 537.)

When examining Claimant's lower extremities, Dr. Nutter noted "pain with range of motion testing in the knees" and reduced range of motion in the knees but not the hips or ankles. (*Id.* at 535, 537.) He wrote, "There does not seem to be any crepitus or laxity in the knees, though guarding does make it difficult to assess," and he did not observe crepitus or laxity in the ankles or feet. (*Id.* at 535.) He observed no tenderness, redness,

warmth, or swelling in the knees, ankles, or feet and "no calf tenderness, redness, warmth, cord sign or Homan's sign." (*Id.*)

When examining Claimant's spine, Dr. Nutter observed "no tenderness over the spinous processes" of Claimant's cervical spine and "no evidence of paravertebral muscle spasm," but he noted decreased range of motion and neck pain upon range of motion testing. (*Id.* at 535, 537.) He observed "normal curvature," no "paravertebral muscle spasm," and "no tenderness to palpation of the . . . spinous processes" of Claimant's dorsolumbar spine. (*Id.* at 535.) He noted that Claimant "complained of pain with range of motion testing of the lumbar spine" and that her range of motion was somewhat reduced. (*Id.* at 535, 537.) A straight-leg-raise test was normal in the sitting and supine positions, and Claimant was able to stand on one leg with some difficulty on the left leg. (*Id.* at 535.) Dr. Nutter observed "no hip joint tenderness, redness, warmth, swelling or crepitus." (*Id.*)

Neurological testing revealed that Claimant's cranial nerves were intact. (*Id.*) Dr. Nutter rated her shoulder strength "3/5 bilaterally" and her elbow and wrist flexion and extension "1/4 bilaterally." (*Id.*) He rated her hip flexion 3/5 but stated, "Hip extension shows that no actual pushing, but she just holds her leg up." (*Id.*) Dr. Nutter rated Claimant's knee strength, dorsiflexion, and toe extension 3/5 and her plantar flexion 1/5. (*Id.*) He wrote, "There is submaximal voluntary effort with strength testing." (*Id.*) He rated her elbow and wrist strength "really at least a 3/5 based on movements against gravity." (*Id.*) He noted "no evidence of atrophy." (*Id.*) He stated that Claimant's "Sensory modalities are well preserved including light touch, pinprick and vibration," but her "Deep tendon reflexes were difficult to elicit." (*Id.*) Dr. Nutter rated Claimant's left triceps and brachioradialis 2/4 "With distraction" and her patellar and Achilles reflexes

"1/4 bilaterally with distraction." (*Id.*)  He stated that Hoffman and Babinski's signs were negative and noted "no clonus." (*Id.*)  He also stated that Claimant's "Cerebellar function is intact." (*Id.*)  He observed that she "seemed . . . unable to walk on her heels and toes and does not seem to be able to perform tandem gait" and "was unable to squat due to left knee and left calf pain." (*Id.*)

Dr. Nutter diagnosed Claimant with diabetes, posttraumatic degenerative arthritis, and chronic cervical and lumbar strain. (*Id.*)  He concluded by stating that "There are positive physical findings related to" Claimant's complaints of "problems with diabetes with symptoms of neuropathy as well as back pain, neck pain and joint pain . . . as documented . . . in the physical exam." (*Id.*)

2. *Consultative Psychological Examination: Cherie Zeigler, M.A.*

Licensed psychologist Cherie Zeigler, M.A. ("Ms. Zeigler") completed a consultative psychological examination of Claimant on March 13, 2017. (*Id.* at 527–30.) Under "General Observations," Ms. Zeigler wrote that Claimant "was casually dressed with a disheveled appearance" and that her sister drove her to the appointment but "waited outside and did not participate" in the examination." (*Id.* at 527.) She noted that Claimant "was the sole informant for the clinical interview and was considered to be a reliable source of information." (*Id.*)  Under "Psychosocial History," Ms. Zeigler noted that Claimant reported "living in the family home with her mother, father, and a brother and sister" and that she "worked in housekeeping for a cleaning service until 2005" but "stopped working because she could not keep up due to the neuropathy in her hands and feet from her diabetes" and "became too slow to be able to complete the work." (*Id.*) Claimant listed diabetes, balance problems, cataracts, memory problems, neuropathy, hearing problems, a torn rotator cuff in her right shoulder, bone spurs on her left knee,

and arthritis as her "Chief Complaints." (*Id.*) She identified frequent falls, poor balance, numbness and pain her hands and feet, right shoulder pain, poor memory, nervousness, worry, poor sleep, and lack of interest as her "Presenting Symptoms." (*Id.* at 528.) Claimant told Ms. Zeigler that she saw "a psychiatric intern" but "was not doing well with this intern" and felt that her family doctor better treated her depression and anxiety with medication. (*Id.*)

Upon mental status examination, Ms. Zeigler observed that Claimant's "appearance was fair in terms of hygiene and she was disheveled." (*Id.* at 529.) She noted that Claimant "was cooperative and attentive," fully oriented, and had "normal" speech "in that there was no circumstantial or tangential thinking present." (*Id.*) Ms. Zeigler observed that Claimant had an anxious mood and a nervous affect, but her "Psychomotor behavior was considered to be normal as there was no agitation observed." (*Id.*) Claimant had normal thought processes, and her "Thought content was relevant to conversation." (*Id.*) She had normal perception, good insight and judgment, and she denied suicidal or homicidal ideation. (*Id.*) Ms. Zeigler observed that Claimant's immediate memory was average, her recent memory was deficient, and her remote memory was within normal limits. (*Id.*) She had deficient concentration, normal persistence, and a slow pace. (*Id.*) Her social functioning during the examination was good, and Ms. Zeigler noted that Claimant "was pleasant and cooperative." (*Id.*) Claimant self-reported that she wakes up at 8:00 in the morning, bathes, dresses, takes her medications, sometimes gets breakfast, and "picks up the house," then she takes a nap at 11:00 and fixes lunch, but "Her mother does the main cooking." (*Id.*) She told Ms. Zeigler that "There are some days that she does nothing because she feels bad and has not slept well the night before." (*Id.*) She also stated that she reads the newspaper and does word searches and attends church with her

family on Wednesdays, Saturdays, and Sundays. (*Id.*) Claimant reported that her mother does the laundry, she and her father go grocery shopping, and her mother and father pay the bills. (*Id.*)

On Axis I, Ms. Zeigler diagnosed Claimant with "Unspecified Depressive Disorder Moderate, with Anxious Distress" based on her "self-report of treatment for depression, the records and clinical observation of anxiety today." (*Id.* at 529–30.) On Axis II, Ms. Zeigler diagnosed Claimant with "History of Borderline Intellectual Functioning" based on Claimant's "self-report of special education classes and the record." (*Id.* at 530.) On Axis III, Ms. Zeigler diagnosed Claimant with diabetes, balance problems, cataracts, neuropathy, torn rotator cuff on right shoulder, bone spurs on the left knee, and arthritis based on Claimant's "self-report and the record." (*Id.*) She gave Claimant a "poor" prognosis due to her "family history of severe diabetes," "problems controlling her diabetes and . . . severe neuropathy and cataracts," and "unresolved medical issues that require surgery and her mood is not controlled." (*Id.*) Ms. Zeigler stated that Claimant "would be able to manage any money [she] would receive." (*Id.*)

*C. Sequential Evaluation Process*

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no

finding is made, the analysis advances to the next step.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments.  *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001).  An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled."   20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).   "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'"  *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20

C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant had not engaged in substantial gainful activity since the alleged onset of her disability. (Tr. at 14.) She found that Claimant's diabetes mellitus, neuropathy, obesity,

right shoulder degenerative joint disease, osteoarthritis, urinary incontinence, depressive disorder, anxiety disorder, and borderline intellectual functioning constituted "severe" impairments.  (*Id.* at 14–15.)    However, she found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 15–17.)  Upon assessing Claimant's RFC, the ALJ determined that she is able "to perform light work . . . except [she] can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; frequently handle bilaterally; never reach overhead with the right arm; [and] frequently reach in all other directions with the right, dominant arm." (*Id.* at 17.)  She also determined that Claimant "needs sit/stand option at one hour intervals, but could sit a total of 6 hours of an 8-hour workday; and needs ready access to the restroom." (*Id.*)  The ALJ further found that Claimant "needs to avoid concentrated exposure to extreme cold and wetness" and "avoid even occasional exposure to hazards of moving machinery and unprotected heights." (*Id.*)  In addition, she determined that Claimant "can perform simple, routine, repetitive tasks," have "occasional interaction with others," can manage "only occasional changes in the work setting," and cannot work on a "production line schedule." (*Id.*)

The ALJ noted that Claimant has no past relevant work. (*Id.* at 22.) She also noted that Claimant is "a younger individual" with "at least a high school education" and that "[t]ransferability of job skills is not an issue because the claimant does not have past relevant work." (*Id.*) Because the ALJ determined that Claimant was unable to perform the full range of light work, she enlisted a vocational expert to aid in her finding that Claimant is capable of working as a price marker, package labeler, or routing clerk. (*Id.*

at 22–23.)  As a result, the ALJ concluded that Claimant was not "under a disability . . .

since December 20, 2016, the date the [SSI] application was filed." (*Id.* at 23.)

## II.     LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to

deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by

substantial evidence and were reached through application of the correct legal standard."

*Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434

F.3d 650, 653 (4th Cir. 2005) (per curiam)).  "Substantial evidence" is "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion," and it

must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

In other words, this Court "looks to [the] administrative record and asks whether it

contains 'sufficient evidence' to support the agency's factual determinations."  *Id.*

(alteration omitted).  "[T]he threshold for such evidentiary sufficiency is not high."  *Id.*

"In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh

conflicting evidence, make credibility determinations, or substitute [its] judgment for that

of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th

Cir. 1996)).  Even if "reasonable minds [could] differ as to whether a claimant is disabled,"

this Court upholds the ALJ's decision if it is supported by substantial evidence.  *Id.*

(quoting *Craig*, 76 F.3d at 589).

## III.     ANALYSIS

Claimant argues that the ALJ should have concluded that she "grids out" at the

sedentary exertional level pursuant to GRID Rule 201.12.  (ECF No. 16 at 4–5.)  She asks

this Court to reverse the Commissioner's decision and award her benefits or to reverse

the Commissioner's decision and remand this matter to the ALJ.  (*Id.* at 6.)   The

14

Commissioner responds that the ALJ properly relied on the vocational expert's testimony in finding that Claimant could perform three light-level representative jobs although she could not perform the full range of light work.  (ECF No. 17 at 9–13.)

"The Medical–Vocational Guideline (GRID) Rules . . . reflect the major functional and vocational patterns encountered in cases that cannot be evaluated on medical considerations alone, where an individual with a severe medically determinable physical or mental impairment is not engaging in substantial gainful activity and the individual's impairment prevents the performance of his vocationally relevant past work." *Loudermilk v. Astrue*, No. 1:07-cv-141, 2009 WL 2584733, at *7 (N.D.W. Va. Aug. 18, 2009).  The GRID rules may be used at step five of the sequential evaluation process to aid the Commissioner in meeting his burden to "prov[e] that significant numbers of jobs exist in the national economy" that the claimant may perform.  *Bisceglia v. Colvin*, No. 3:15-cv-83 (JRS), 2016 WL 8715582, at *4 (E.D. Va. Feb. 19, 2016) (citing *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987)), *adopted by* 173 F. Supp. 3d 326 (E.D. Va. 2016).  "Where the findings of fact made [by the ALJ] with respect to a particular individual's vocational factors and [RFC] coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled."  20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(a).  But if "any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and, accordingly, does not direct a conclusion of disabled or not disabled." *Id.*

GRID Rule 201.12, which Claimant contends applies here, provides that an individual who is limited to sedentary work, is closely approaching advanced age, is at least a high school graduate, and has unskilled or no previous work experience is deemed

disabled.  *Id.* § 201.00 tbl.1.  But the ALJ in this case found that Claimant had the RFC to perform a limited range of *light* work.  (Tr. at 17.)  As support for her assertion that she is instead restricted to sedentary work, Claimant points to consultative medical examiner Dr. Nutter's "positive physical findings . . . for diabetes, posttraumatic degenerative arthritis, and chronic cervical and lumbar strain" and consultative psychological examiner Ms. Zeigler's "positive mental findings . . . for unspecified depressive disorder (moderate, with anxious features), borderline intellectual functioning, and a 'poor' prognosis."  (ECF No. 16 at 5.)  The ALJ summarized Dr. Nutter's and Ms. Zeigler's consultative examination findings in his review of the medical evidence of record.  (Tr. at 19–20.)  However, she noted that neither "provide[d] functional limitations" for use in the RFC assessment.  (*Id.* at 21–22.)  She nonetheless assigned "great weight to the objective findings by Dr. Nutter because they are consistent with the evidence" and "some weight" to Ms. Zeigler's examination findings for the same reason, although she gave "more weight to the findings of the state agency psychologists" because they "assessed functional limitations." (*Id.*)  Notably, Claimant does not assert that either Dr. Nutter or Ms. Zeigler opined that she is limited to the sedentary exertional level but rather appears to rely on their diagnoses of her physical and mental conditions.  (ECF No. 16 at 4–5.)  But "it is not enough to merely point to a medical diagnosis in order to establish disability. Instead, Claimant must also show how that condition results in actual functional limitation."  *Parsons v. Berryhill*, No. 3:18-cv-01107, 2019 WL 2252023, at *11 (S.D.W. Va. May 2, 2019), *adopted by* 2019 WL 2256395 (S.D.W. Va. May 24, 2019).  She makes no effort to do so in this case.

More importantly, the ALJ's RFC assessment is supported by substantial evidence. The ALJ essentially adopted the state-agency medical consultants' opinions that Claimant

can perform light work, although she explained that she "added limitations for the combination of the claimant's conditions." (Tr. at 21–22.) Their opinions may provide a basis for the RFC assessment. *See Pine v. Berryhill*, No. TJS-17-1897, 2018 WL 3973078, at *2 (D. Md. July 2, 2018); *see also Young-Schonyers v. Colvin*, No. 0:13-cv-02951-JMC, 2015 WL 1522367, at *7 (D.S.C. Mar. 31, 2015) ("The ALJ adequately explained his RFC findings and cited to the evidence of record forming the basis for his determination . . . ."). Therefore, because the ALJ properly concluded that Claimant is limited to light work, not sedentary work, GRID Rule 201.12 does not apply in this case. 20 C.F.R. § 416.969 ("[W]e do not apply these rules if one of the findings of fact about the person's vocational factors and [RFC] is not the same as the corresponding criterion of a rule."). Moreover, the GRID rules "are not to be treated as conclusive" when, as here, the claimant "has nonexertional limitations in addition to exertional limitations." *Gordon v. Berryhill*, No. 2:17-cv-02280-MGL-MGB, 2019 WL 653966, at *10 (D.S.C. Jan. 28, 2019) (citing 20 C.F.R. § 404.1569; *Roberts v. Schweiker*, 667 F.2d 1143, 1145 (4th Cir. 1981); *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)), *adopted by* 2019 WL 652073 (D.S.C. Feb. 14, 2019). As such, the undersigned **FINDS** that the ALJ committed no error.

*IV.    CONCLUSION*

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 16), **GRANT** the Commissioner's request to affirm his decision (ECF No. 17), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers,

United States District Judge.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties and provided to Judge Chambers.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: December 23, 2020

Dwane L. Tinsley
United States Magistrate Judge

18